# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CLARENCE RANDOLPH** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO: 08-1982** |
| **BURL CAIN, WARDEN** | * | **SECTION: "I"(3)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.

For the following reasons, it is **HEREBY RECOMMENDED** that the instant petition be denied on the merits.

## PROCEDURAL HISTORY

Petitioner, Clarence Randolph, a prisoner incarcerated in the Louisiana State Penitentiary, Angola, Louisiana, was indicted by a grand jury on the charge of aggravated rape (count 1) in violation of La. R.S. 14:42. Petitioner was also charged by bill of information with aggravated incest (count 2) in violation of La. R.S. 14:78.1. Petitioner pled not guilty and the matter proceeded to trial by jury. On March 24, 2004, petitioner was found guilty as charged on each count. Petitioner moved for a post-verdict judgment of acquittal and a new trial, but his motions were denied. On April 4, 2004, petitioner was sentenced to life at hard labor without benefit of parole,

probation, or suspension of sentence for the aggravated rape conviction and to twenty years at hard labor for the aggravated incest conviction, with both sentences to run concurrently.

On May 6, 2005, pursuant to petitioner's appeal, the Louisiana First Circuit Court of Appeal affirmed petitioner's convictions and sentences.  State v. Randolph, Number 2004 KA 1967, 903 So.2d 23 (La. App. 1 Cir. 2005) (table).[1]  Less than a year later, on February 10, 2006, the Louisiana Supreme Court denied petitioner's writ application.  State v. Randolph, 924 So.2d 166 (La. 2006).

On January 4, 2007, petitioner filed with the state district court an application for post-conviction relief which the court denied on February 9, 2007.[2]  On March 5, 2007, petitioner filed a writ application with the Louisiana First Circuit Court of Appeal seeking relief in connection with the district court's February 9, 2007 adverse decision.[3]  On April 18, 2007, the state appellate court denied petitioner's writ application.  State v. Randolph, Number 2007 KW 0411 (La. App. 1 Cir. Apr. 18, 2007).[4]  On May 15, 2007, petitioner filed a writ application with the Louisiana Supreme Court in connection with the state appellate court's April 18, 2007 adverse decision.[5]  On March 7,

---

[1]A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 7 of 7.

[2]A copy of petitioner's post-conviction application is contained in the State rec., vol. 7 of 7.

[3]A copy of petitioner's writ application to the Louisiana First Circuit is contained in the State rec., vol. 7 of 7.

[4]A copy of the Louisiana First Circuit's unpublished decision is contained in the State rec., vol. 7 of 7.

[5]In the State rec., vol. 7 of 7, is a copy of correspondence from John Tarlton Olivier, Clerk of Court for the Louisiana Supreme Court acknowledging that petitioner's writ application, Number 2007-KH-1118, "was post-marked on 5/15/2007."

2008, the Louisiana Supreme Court denied petitioner relief. <u>State ex rel. Randolph v. State</u>, 977 So.2d 902 (La. 2008).

On March 28, 2008, petitioner filed the instant action for federal habeas relief.[6]  In its response, the State concedes that petitioner has exhausted his state court remedies as required under <u>Rose v. Lundy</u>, 455 U.S. 509 (1982), but argues that petitioner's habeas application is time-barred. For the following reasons, the court finds that petitioner's action is, in fact, timely.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner has one year within which to bring his habeas corpus claims pursuant to 28 U.S.C. § 2254, with this one year period commencing to run from "the latest of" either the date the petitioner's state judgment became final or the expiration of his time for seeking review.[7]  <u>See</u> 28 U.S.C. § 2244(d)(1) (West 2008), as amended by the AEDPA, P.L. 104-132, 110 Stat. 1220.  In this case, petitioner's conviction became final on February 10, 2006, when the Louisiana Supreme Court denied his writ application in connection with his direct appeal proceedings, and his time for seeking review expired on or about May 10, 2006, 90 days following his final state court judgment, when his time for filing a petition for a writ of certiorari with the United States Supreme Court expired. <u>See</u> Sup.Ct.R. 13(1);

---

[6]<i>See</i> Federal rec., doc. no. 1.  This March 28, 2008 filing date was ascertained via the court's use of the prison "mailbox" rule.  Under this rule, a pleading filed by a prisoner acting pro se is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing, rather than the date it is received by the court. <u>Cooper v. Brookshire</u>, 70 F.3d 377, 379 (5th Cir. 1995).  Generally, the date a prisoner signs his petition or accompanying pauper application is presumed to be the date he delivered it to prison officials for mailing.  <u>See</u> <u>Colarte v. Leblanc</u>, 40 F.Supp.2d 816, 817 (E.D. La. 1999); <u>Magee v. Cain</u>, 2000 WL 1023423, *4 n.2 (E.D. La. 2000); <u>Punch v. State</u>, 1999 WL 562729, *2 n.3 (E.D. La. 1999).

[7] The AEDPA applies to this case as it was filed after the enactment of the AEDPA, or after April 24, 1996.  <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997).

see also Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999), cert. denied, 529 U.S. 1099, 120 S.Ct. 1834, 146 L.Ed.2d 777 (2000); Habteselassie v. Novak, 209 F.3d 1208, 1209 (10th Cir. 2000); Harris v. Hutchinson, 209 F.3d 325, 328 n.1 (4th Cir. 2000). Thus, petitioner had a year from May 10, 2006, until May 10, 2007, to timely seek habeas corpus relief.

Petitioner did not file the instant action until March 28, 2008, almost a year after his limitation period had expired. Thus, petitioner's federal habeas corpus application must be dismissed as untimely, unless the one-year statute of limitations period was interrupted as set forth in 28 U.S.C. § 2244(d)(2). Under that statutory provision, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

On January 4, 2007, petitioner filed an application for post-conviction relief with the state district court, thereby suspending the running of prescription.[8] At that point, approximately seven and a half months of petitioner's twelve-month prescriptive period had expired.

By virtue of petitioner commencing state post-conviction proceedings, his statute of limitations remained suspended until March 7, 2008, when the Louisiana Supreme Court denied his application for post-conviction relief. At that point, prescription once again commenced to run and

---

[8]This January 4, 2007 filing date, along with the filing dates associated with petitioner's other state court pleadings, was ascertained by employing the prison "mailbox" rule first enunciated in Houston v. Lack, 487 U.S. 266 (1988). See Causey v. Cain, 450 F.3d 601, 604-607 (5th Cir. 2006); Weaver v. Cain, 2005 WL 1400409, *2-5 (E.D. La. 2005). As noted earlier, see discussion supra at n. 6, a pleading, under the "mailbox" rule, is considered filed for prescriptive purposes on the date it is delivered to prison authorities for mailing, rather than the date it is actually received by the court. See Cooper, 70 F.3d at 379. Generally, the date a prisoner signs his or her pleading is presumed to be the date it was delivered to prison officials for mailing. See Colarte, 40 F.Supp. at 817.

continued to run for approximately twenty-one days until petitioner, on March 28, 2008, filed the instant action. Because petitioner, at the time he filed his federal habeas petition, still had almost four months of his one-year prescriptive period remaining, the instant matter is clearly not time-barred. Accordingly, the court shall review the applicable facts and proceed to address the merits of petitioner's claims after considering petitioner's pending motion to expand the record (rec. doc. 7), along with the State's opposition (rec. doc. 11, pp. 17-18) to said motion.

Petitioner, pursuant to his motion to expand the record, seeks to file numerous documents which he has attached to his motion and seeks to have this court order the production of his state trial transcript, exhibits introduced at trial, and state "discovery materials". However, the transcript, exhibits, and discovery materials have, for the most part, already been produced and comprise a portion of petitioner's seven-volume state court record. Further, the documents with which petitioner seeks to expand the record are already contained in the state record and/or are not germane to the issues set forth in petitioner's habeas application. Accordingly, **IT IS HEREBY ORDERED** that petitioner's motion to expand the record is **DENIED**.

## FACTS

The female victim, R.B., was born on April 20, 1983, in New Orleans, Louisiana. R.B.'s parents divorced when she was five years old. Her mother later married petitioner on January 31, 1989. R.B.'s mother worked at the school board during the day and as a home health nurse at night. Petitioner was on disability and did not work outside the home. Petitioner took care of the household chores which included getting R.B. and her younger brother, B.B., ready for school each morning. Petitioner would take R.B. and B.B. into his bedroom and help them dress. Eventually,

petitioner ceased bringing B.B. into the bedroom but continued bringing R.B. While alone in the bedroom with R.B., petitioner started touching R.B.'s vaginal area with his hand, then progressed to touching that area with his penis. This allegedly occurred while R.B. was in the fourth grade.

In 1993, at the conclusion of R.B.'s fourth-grade year, the family moved to Covington, Louisiana. Allegedly, within two months of the move, petitioner began having vaginal intercourse with R.B., who was ten years old. Afterward, R.B. would go to the bathroom and clean herself, which petitioner showed her how to do. Petitioner usually had sex with R.B. in his bedroom while B.B. was asleep. Petitioner did not make any noise and he instructed R.B. not to make any noise. He also made sure all of the doors were locked before initiating any sexual activity.

R.B. became pregnant at thirteen years old. Petitioner made R.B. take a home pregnancy test that he purchased. Petitioner took R.B. to a physician who confirmed that she was pregnant, and then to an abortion clinic in New Orleans. At the clinic, they learned that her pregnancy was too advanced for an abortion to be performed. On the way home from the clinic, petitioner instructed R.B. to tell her mother that at the bowling alley she had sex with a boy from the neighborhood. Upon learning that R.B. was pregnant, her mother initially decided to give the baby up for adoption. In 1997, during spring break, R.B. gave birth to a baby girl at a Baton Rouge hospital. The victim's mother decided to keep the baby girl and raise her as her own child. R.B. returned to Madisonville Junior High School and completed her eighth-grade year. Petitioner continued to have sexual intercourse with R.B. until she turned seventeen.

In August 2000, the victim's mother sought legal representation to initiate a divorce from petitioner. R.B. previously had denied that anything inappropriate had occurred between her and

petitioner. However, when the attorney asked R.B. if anything inappropriate had occurred between her and petitioner, she admitted that there had been inappropriate sexual contact between herself and petitioner.

The victim's mother contacted the police, who directed her to contact the Office of Community Services (O.C.S.). O.C.S. investigated R.B.'s allegations and contacted the police. The police initiated their own investigation, which included having a DNA test performed by Reliagene Technologies. The DNA testing reflected that there is a 99.999 percent probability that petitioner is the father of R.B.'s daughter.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

§ 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary

to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams</u>[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); <u>see also</u> <u>Hill</u>, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## ANALYSIS

### A. Insufficiency of Evidence

Petitioner complains that insufficient evidence was submitted to support his conviction for aggravated rape. When conducting a post-AEDPA sufficiency of the evidence review, a federal court may grant relief only if it determines that the state court decision rested on an "unreasonable application" of clearly established Federal law, as determined by the Supreme Court, to the facts of the case. <u>See</u> 28 U.S.C. § 2254 (d)(1).

In its analysis of petitioner's insufficiency of evidence claim, the Louisiana First Circuit Court of Appeal first set forth the applicable Supreme Court law, along with corresponding state law, stating:

The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). <u>See also</u> La.C.Cr.P. art. 821(B), which provides: "[a] post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." The <u>Jackson</u> standard of review has been incorporated into Article 821(B) to provide an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La.R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. <u>State v. Hendon</u>, 94-0516, p. 4 (La. App. 1ˢᵗ Cir. 4/7/95), 654 So.2d 447, 449.

<u>Randolph</u>, Number 2004 KA 1967, p. 4.

The state appellate court then examined the essential elements of the applicable crime, asserting:

> Prior to the 2001 amendment, La. R.S. 14:41(A) defined rape as the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent. Emission is not necessary and any sexual penetration, vaginal or anal, however slight, is sufficient to complete the crime. La. R.S. 14:41(B).
> Prior to the 2001 and 2003 amendments, aggravated rape was defined, in pertinent part, as a rape where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed when the victim is under the age of twelve years.[9] Lack of knowledge of the victim's age shall not be a defense. La. R.S. 14:42(A)(4).

<u>Randolph</u>, Number 2004 KA 1967, p. 5.

Thereafter, the Louisiana First Circuit summarized the State's burden of proof and examined the evidence presented at trial in the context of petitioner's argument regarding why the evidence

---

[9]At the time of the instant offense, La. R.S. 14:42(A)(4) provided that the victim be under twelve years old. 2003 La. Acts No. 795, § 1, changed the victim's age from twelve to thirteen.

was insufficient, ultimately concluding, based upon the standard set forth in Jackson, supra, that the

State had satisfied its burden of proof.

In order to sustain a conviction for aggravated rape, the State had to prove that the defendant had (1) anal or vaginal sexual intercourse with R.B., (2) when she was under twelve years old. La. R.S. 14:42(A)(4).

Defendant asserts the testimony of R.B. was not credible because she did not complain about being raped until years after the alleged sexual activity had taken place. Defendant further argues that even if he impregnated R.B. when she was thirteen years old, this does not mean that an aggravated rape occurred.

A DNA paternity test confirmed the defendant was the father of R.B.'s child, born in 1997 when R.B. was thirteen years old. However, R.B. testified the defendant began having sexual intercourse with her when the family moved to Covington at the end of the fourth-grade year. The facts in the record clearly reflect that R.B. was born in 1983, that she did well academically and did not fail any grades. Therefore, R.B. would have been ten years old when she completed the fourth grade. Thus, R.B. was clearly under twelve years of age at the time this offense occurred.

The State also presented the testimony of JoBeth Rickles of the Children's Advocacy Center (CAC) in St. Tammany Parish. Ms. Rickles is employed as a forensic interviewer by CAC. She explained that a forensic interviewer conducts interviews of children in a non-threatening environment. The interview is recorded by camera and conducted such that only the interviewer is in the room with the child while the investigator observes from a different room. Ms. Rickles, along with Debbie Melancon, observed R.B.'s forensic interview. Ms. Rickles observed R.B. disclose to the interviewer that her stepfather, the defendant, had rubbed on her sexually when she was in the fourth grade and progressed to full sexual intercourse when she was in the fifth grade. Ms. Rickles testified that R.B. disclosed that penetration occurred when she was in the fifth grade and around ten or eleven years old.

The defendant also argued that an aggravated rape did not occur because R.B.'s testimony about the vague threats she received from the defendant does not show that she ever felt physically threatened. As previously noted, at the time of the offense La. R.S. 14:42(A)(4) defined aggravated rape as vaginal sexual intercourse deemed to be without lawful consent of the victim because it is committed when the victim is under twelve years old. Therefore, the State need only prove the defendant engaged in vaginal sexual intercourse with the victim when she was under twelve. Force is not an element of aggravated rape in this case. See State v. Taylor, 36,066, p. 14 (La. App. 2nd Cir. 6/12/02), 821 So.2d 633, 642, writ denied, 2002-2068 (La. 6/20/03), 847 So.2d 1222. This argument is without merit.

In finding the defendant guilty of aggravated rape, it is obvious that the jury believed the testimony of the state's witnesses and rejected the defendant's argument that the victim was not credible.

We have previously observed in State v. Creel, 540 So.2d 511, 514 (La. App. 1st Cir.), writ denied, 546 So.2d 169 (La. 1989), that the testimony of the victim is sufficient to establish the elements of the offense. Furthermore, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31, 38 (La. App. 1st Cir. 1984). Moreover, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Richardson, 459 So.2d at 38. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. Creel, 540 So.2d at 514.

Upon a thorough review of the record in its entirety, we find that any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could find the State established the essential elements of aggravated rape beyond a reasonable doubt.

Randolph, Number 2004 KA 1967, pp. 5-7.

Based upon the above, it is clear that the state court properly examined the elements necessary to prove aggravated rape and determined, examining the evidence in a light most favorable to the prosecution, that all of the elements had been proven. As such, the court finds that the Louisiana First Circuit Court of Appeal did not unreasonably apply the applicable law enunciated by the Supreme Court in Jackson, supra.[10]

---

[10]In addition to the arguments clearly set forth before the Louisiana First Circuit in connection with his direct appeal, petitioner, in his federal habeas application (rec. doc. 3, pp. 8-9), suggests that there was a lack of physical evidence identifying him as the father of the child. However, a review of the trial transcript clearly refutes this allegation. Dr. Meagan Shaffer, a microbiologist employed by Reliagene Technologies, testified that the child was brought to Reliagene Technologies where a DNA sample was taken from the child and compared with a sample from petitioner taken by the coroner's office. Testing of the two samples revealed a 99.999 percent probability that petitioner was the child's father. See State rec., vol. 6 of 7, pp. 642-643 and 658-663.

**B. Denial of Motion for Mistrial**

Petitioner argues that his constitutional rights were violated when the trial court failed to declare a mistrial as a result of the prosecutor's closing remark regarding petitioner's failure to present independent DNA testing. In addressing the instant issue in connection with petitioner's direct appeal, the Louisiana First Circuit explained the context in which the prosecutor made his objectionable comment.

During the trial, Doctor Meagan Shaffer of Reliagene Technologies was accepted by the court as an expert in the field of paternity DNA testing. Dr. Shaffer testified relative to the DNA samples collected in the instant case. On direct examination, she testified about the method of collection, the chain of custody and the results of the testing. On cross-examination, defense counsel questioned Dr. Shaffer concerning the accuracy of the testing, contamination and tampering, and storage of the samples. Dr. Shaffer testified:

Q. Do you know what happened to the samples in this particular case after they were tested by Reliagene?

A. The samples were returned to the St. Tammany Police Department via Airborne Express.

Q. Both samples?

A. Yes. All the samples, I believe - actually, I believe just the samples that came from St. Tammany.

Q. Okay. What would have happened to the child's sample?

A. All of our samples are retained in the laboratory unless they are requested. I have a note on this file that says the evidence was returned however.

****

Q. I don't know how significant this is, but do you remember being asked what [sic] about the samples and you said the samples in this particular case were returned to the Sheriff's Office, for the tested man. The child's sample was destroyed?

A.  If the child's sample was not returned and it probably was not because it is not part of the chain of custody for the external, the samples are retained at Reliagene for six months at which point they are destroyed.

Q.  Why would they be destroyed after six months?

A.  Generally, because we run out of storage space.

Q.  That's your policy?

A.  Correct.

In the instant case, the prosecutor made the following remarks in closing:

**THE PROSECUTOR:**

Here, we have something more that helps this decision be easier for us.  We have her getting pregnant as a result of one of the episodes of sexual intercourse.  [R.B.] had that child at age thirteen (13).  We have DNA tests that demonstrate with 99.999 percent probability that the defendant is the father of that child.

[R.B.] and her mother didn't get to pick what DNA lab, it's not like they got to go pick a lab they had a connection to, and could therefore bear some influence on the test results.  That lab choice was made by the Sheriff's office.  They did not have access to the samples.  So there is nothing that should call into question the validity of those test results.

**** 

That's why I think it is so telling the fact that even at that stage he is already objecting, saying I want another test done, I want it in another lab.

Well, guess what, in this type of case, you can do that.  If the defendant really felt that these test results were not valid, were not reliable in this sort of case, where it is a paternity DNA rather than forensic DNA, ... that's a finite sample. ...  This is not the situation here.  Here we have a child who was born as a product of this rape who theoretically has an unlimited source of blood and that additional blood samples could be drawn from that child, from the defendant, sent to lab "B", lab "C", lab "D",  lab "E", if the defendant really felt-

At this point, defense counsel asked to approach the bench.

13

**DEFENSE COUNSEL:**

Your Honor, under the law the defendant is not required to either testify or put on any evidence at all and I think that Mr. Dearing [the prosecutor] is commenting upon our failure or the lack of any evidence being introduced by us when we are not required to do it. It is really a comment.

**THE COURT:**

I think he is right.

**THE PROSECUTOR:**

There are two things I would argue that distinguishes this situation from situations where that might by [sic] unfair remarks. ... [T]he defense drawing attention to the fact that the sample from the girl was destroyed, giving a false impression to the jury that they where [sic] precluded from pursuing additional testing.

**THE COURT:**

I don't think he ever said that.

**THE PROSECUTOR:**

No, that was the implication. He drew attention to the fact that the sample was destroyed after testing. The only reason would be to infer to the jury we can't do testing.

****

**DEFENSE COUNSEL:**

I am going to ask for a mistrial on those grounds.

**THE COURT:**

Okay. I am going to admonish the jury.

All right, ladies and gentlemen, I think I told you all from the beginning that the defendant does not have to put on any evidence. The State is required to prove the case beyond a reasonable doubt. Mr. Dearing has made some comments about him not getting a second test. He is not required under the law to do that. So, all of the comments Mr. Dearing has made about that I would like you all to disregard.

Randolph, Number 2004 KA 1967 at pp. 8-10.

14

It is well established that federal habeas review is limited to questions of constitutional dimension. <u>See</u> <u>generally</u> <u>Jernigan v. Collins</u>, 980 F.2d 292, 298 (5th Cir. 1992), <u>cert</u>. <u>denied</u>, 508 U.S. 978 (1993); <u>Castillo v. Johnson</u>, 141 F.3d 218, 222 and 224 (5th Cir.), <u>cert</u>. <u>denied</u>, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998).  In reviewing a state court evidentiary determination, such as the trial court's determination that a mistrial was not warranted by virtue of the prosecutor's comment regarding petitioner's failure to procure an independent DNA test, the federal habeas court's role "'is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness.'"  <u>Andrade v. McCotter</u>, 805 F.2d 1190, 1193 (5th Cir. 1986), <u>quoting</u> <u>Mattheson v. King</u>, 751 F.2d 1432, 1445 (5th Cir.1985).

In the instant matter, this court finds that the trial judge's alleged error in failing to grant a mistrial did not constitute a denial of fundamental fairness, especially in light of the fact that the trial court admonished the jury to ignore the prosecutor's remark regarding petitioner's failure to procure an independent DNA test.  Accordingly, the instant claim for habeas corpus relief is without merit.

**C.  Invalid Waiver of Counsel**

On or about March 27, 2003, petitioner filed with the state district court a <u>pro</u> <u>se</u> motion seeking "to enroll and participate in trial as co-counsel of record".[11]  Petitioner argued that he had a right to participate as co-counsel not only under the United States Constitution and the Louisiana Constitution, but such a right "has also been recognized by the United States Supreme Court in the case of <u>Faretta v. California</u>, 422 U.S. 836, 95 S.Ct. 2525 (1975)."  The trial court, following an April 14, 2003 hearing at which petitioner, defense counsel, and prosecuting counsel were present,

---

[11]A copy of petitioner's motion is contained in the State rec., vol. 1 of 7, pp. 221-222.

granted petitioner's motion.[12]    Petitioner, in the instant habeas application, attacks the constitutionality of the trial court's action in granting his motion, claiming that the court did not follow the safeguards, set forth under <u>Faretta</u> and its progeny, associated with such a motion.

In <u>Faretta</u>, <u>supra</u>, the Supreme Court recognized that a defendant has a Sixth Amendment right to waive counsel and represent himself.  A defendant's decision in this regard must be "knowingly and intelligently made." <u>McQueen v. Blackburn</u>, 755 F.2d 1174, 1177 (5th Cir.), <u>cert. denied</u>, 474 U.S. 852 (1985), <u>citing</u> <u>McKaskle v. Wiggins</u>, 465 U.S. 168 (1984); <u>Faretta v. California</u>, 422 U.S. 806 (1975).  To ensure that a defendant has made a knowing and intelligent decision, the trial court should make a record which establishes that the criminal defendant "'knows what he is doing and his choice is made with eyes open.'" <u>McQueen</u>, 755 F.2d at 1177, <u>quoting</u> <u>Faretta</u>, 422 U.S. at 835 (quotation omitted).

The trial court, in the instant matter, did not make a record to ensure that petitioner was proceeding with his "eyes open".  However, such precautions were not necessary because petitioner was not waiving his right to counsel and exercising his Sixth Amendment right to represent himself.  Instead, he was seeking to act as co-counsel.  A defendant has no constitutional right to "engage in hybrid representation whereby he and his attorney ... act as co-counsel." <u>United States v. Cano</u>, 519 F.3d 512, 516 (5th Cir. 2008), <u>citing</u> <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 182 (1984).  As such, the above-delineated safeguards, required in connection with a defendant's request to represent himself,

---

[12]A copy of the transcript of the April 14, 2003 hearing is contained in the State rec., vol. 2 of 7, pp. 331A-331B.

did not attach and petitioner, by virtue of the trial court's failure to follow these safeguards, suffered no constitutional violation.

### D.  Ineffective Assistance of Counsel

The seminal Supreme Court decision regarding ineffective assistance of counsel is <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the <u>Strickland</u> test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993), <u>citing</u> <u>Strickland</u>, 466 U.S. at 690.  To prove prejudice under the <u>Strickland</u> standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

A review of the trial transcript reflects that Dr. Michael Murray was the associate director of Reliagene Technologies at the time the pertinent DNA testing was performed and that Dr. Murray "signed" the pertinent test results.[13]  Dr. Murray, however, had retired from Reliagene Technologies by the time petitioner's case went to trial and did not testify at trial.[14]  Petitioner argues that counsel

---

[13]<u>See</u> State rec., vol. 6 of 7, pp. 673-674.

[14]<u>See</u> State rec., vol. 6 of 7, pp. 664-665.

was ineffective in failing to locate and interview Dr. Michael Murray prior to trial and secure his appearance at trial.[15]

A review of the trial transcript reflects that Dr. Meagan Shaffer, who had become the Assistant Director of the Paternity Department of Reliagene Technologies the year after the pertinent DNA testing was performed, testified with regard to the DNA test results.[16]  The fact that Dr. Shaffer, as opposed to Dr. Murray, was offering this testimony was not an unusual occurrence.  Dr. Shaffer informed that no one Reliagene doctor or technician is responsible for Reliagene test results.  The DNA testing or, "sample processing", is performed "very much in an assembly line sort of fashion.  The samples are logged in by one technician, DNA extracted by a second, amplification by a third and analysis and result reporting would be done by at least one additional."[17]  All of the technicians or doctors involved in the cumulative testing process have to concur with the test results before one particular doctor signs the report.[18]  Dr. Shaffer has provided expert testimony regarding DNA test results in other trials where she was not personally involved in the testing process.[19]  She explained that she sometimes testifies for the defense and other times for the prosecution, never "tak[ing] sides", but rather, "simply report[ing] the results of the testing".[20]

---

[15]See Federal rec., doc. 3-2, p. 17.

[16]See State rec., vol. 6 of 7, pp. 664-665.

[17]See State rec., vol. 6 of 7, pp. 671-672.

[18]See State rec., vol. 6 of 7, p. 674.

[19]See State rec., vol. 6 of 7, p. 673.

[20]See State rec., vol. 6 of 7, pp. 648-649.

The "results of the testing" performed in this case reflect a 99.999 percent probability that petitioner is the father of R.B.'s child.[21] Petitioner makes no showing to the effect that Dr. Murray would have testified any differently. In fact, the testimony, as set forth above, reflects the opposite to be true. Accordingly, petitioner has failed to satisfy his burden of proving that he was prejudiced by counsel's alleged deficiency in failing to interview Dr. Murray prior to trial and procure his testimony regarding the pertinent DNA test results.

Petitioner next asserts that counsel should have performed a more thorough investigation, arguing that he should have realized that the case would come down to a "credibility contest" between the victim and petitioner. One step which petitioner suggests that counsel should have taken was to "investigate and interview" Darren Wheaton, the person who the victim originally named as the father of her child. Again, however, petitioner cannot show how he was prejudiced by counsel's failure to interview Darren Wheaton in light of the fact that paternity testing showed a 99.999 percent probability that he, and not Darren Wheaton, is the father of the victim's child.

Finally, in his response (rec. doc. 12, p. 13) to the State's objections, petitioner asserts that counsel was ineffective due to his failure to seek a dismissal of the charges lodged against him based upon the fact that his right to a speedy trial had been violated. The Sixth Amendment guarantees a defendant in a criminal case the right to a speedy trial. Barker v. Wingo, 407 U.S. 514, 519-522 (1972). Under Barker, 407 U.S. at 530, a court must consider four factors in assessing a speedy trial claim: 1) The length of the delay; 2) The reason for the delay; 3) The defendant's assertion of his right; and, 4) Prejudice to the defendant resulting from the delay.

---

[21]See State rec., vol. 6 of 7, p. 662.

In the instant matter, petitioner was formally charged with aggravated rape and aggravated incest in December, 2000.[22] Petitioner was not convicted on the charges until March, 2004. While petitioner claims that counsel was ineffective for not seeking to have the charges dismissed based upon the delay in bringing him to trial, a review of the record reveals that much of the delay in proceeding to trial was attributable to defense and none was attributable to any bad faith on the part of the prosecution.

On January 31, 2001, J. Jackson Stamps filed a motion to enroll as counsel on behalf of petitioner and promptly filed a motion to continue the trial, which the trial court granted.[23] On March 2, 2001, defense counsel filed a second motion to continue trial, which the trial court granted, stating that petitioner required additional time to "gather discovery and prepare for trial on the merits."[24] On May 25, 2001, defense counsel filed a third motion to continue trial due to a conflict in his trial schedule.[25] Once again, pursuant to defense counsel's request, the trial was continued. On September 7, 2001, defense counsel filed yet another motion to continue the trial base upon the fact that he had not yet "received independent DNA test results."[26] On October 12, 2001, defense counsel filed a fifth motion to continue trial, again complaining of a scheduling conflict and the fact

---

[22]A copy of the bill of information charging petitioner with aggravated incest is contained in the State rec., vol. 1 of 7, p. 132. A copy of the indictment charging petitioner with aggravated rape is contained in the State rec., vol. 1 of 7, p. 134.

[23]See State rec., vol. 1 of 7, pp. 152 and 153.

[24]See State rec., vol. 1 of 7, pp. 168-170.

[25]See State rec., vol. 1 of 7, p. 174.

[26]See State rec., vol. 1 of 7, p. 176.

that he had not yet received the DNA test results.[27]  On February 6, 2002, a joint motion to continue the trial was filed due to the fact that blood samples from the State, required to perform the necessary DNA test, had not been received.[28]  Then, on April 2, 2002, counsel J. Jackson Stamps filed a motion to withdraw as counsel because petitioner had purportedly "secured the service of other counsel, Marion Farmer, of Farmer and Burns."[29]  However, in August, 2002, Doyle Spell, Jr, rather than Marion Farmer, filed a motion to enroll as counsel on behalf of petitioner.[30]  Shortly thereafter, Mr. Spell, based upon the fact that he had just enrolled as counsel, filed a motion to continue the trial.[31]  In October, 2002, another joint motion for continuance was filed based upon the fact that counsel were still awaiting DNA test results.[32]  In January, 2003, petitioner filed a pro se motion to continue the trial based, in part, upon the fact that a blood sample for the DNA testing had not yet been received.[33]

Following the January, 2003 motion for continuance of trial, petitioner filed a series of pro se pleadings, including a pleading seeking to dismiss Mr. Spell has his counsel.[34]  Following the

---

[27]See State rec., vol. 1 of 7, p. 178.

[28]See State rec., vol. 1 of 7, p. 181.

[29]See State rec., vol. 1 of 7, p. 182.

[30]See State rec., vol. 1 of 7, p. 183.

[31]See State rec., vol. 1 of 7, p. 184.

[32]See State rec., vol. 1 of 7, p. 185.

[33]See State rec., vol. 1 of 7, pp. 192-193.

[34]See State rec., vol. 1 of 7, pp.  200-202; 204-227.

resolution of said pleadings, along with matters filed by counsel, petitioner, in November, 2003, filed a motion seeking to dismiss newly appointed counsel, John McGuckin.[35] The trial court, on November 6, 2003, denied petitioner's motion, providing: "It should be noted that every time we get close to trial on this matter defendant fires his attorney."[36] Thereafter, petitioner, along with counsel, continued to file pre-trial motion up until March, 2004, when the matter, at last, proceeded to trial.[37]

Based upon the above, it is clear that the delay between the time petitioner was charged and the time he proceeded to trial was chiefly attributable not to any deficiency on the part of counsel, but rather, to petitioner's firings of defense attorneys as his trial dates approached. Further, assuming arguendo that counsel was deficient, petitioner has failed to show how he was prejudiced as a result of counsel's deficiency. Accordingly, petitioner's claim for federal habeas relief based upon counsel's allege ineffectiveness is without merit.

### E. Trial Court Failed to Commence Trial Timely

Petitioner argues that his constitutional rights were violated by virtue of the trial court's failure to commence his trial within a reasonable period following his October, 2000 arrest and December, 2000 formal charges. In support of his claim, petitioner points to state law to support the proposition that "motions to secure counsel" and "withdrawal of counsel" should not play a role in determining whether or not a criminal defendant's trial was unconstitutionally delayed. Petitioner

---

[35]See State rec., vol. 1 of 7, pp. 230-233.

[36]See State rec., vol. 1 of 7, p. 233.

[37]See State rec., vol. 1 of 7, pp. 234-239.

suggests that regardless of the fact that much of the delay in proceeding to trial may have been attributable to his actions, "the primary responsibility to timely try a defendant rests upon the state" and "the burden is upon the state to show that Petitioner has not been prejudiced by the delay".  In support of this argument, petitioner cites Hoskins v. Wainwright, 440 F.2d 69, 72 (5th Cir. 1971), wherein the court "require[d] that the State assume the burden of demonstrating that the [over eight year delay between the time the charge was lodged and the time of trial] was not prejudicial to the appellant."  However, the court specified that its holding in this regard was specifically limited to the unique facts of that particular case.  Specifically, the court provided:

> We do not mean to establish a uniform rule that the State should assume the burden of proof in every case where the defendant alleges that he has been denied his right to speedy trial.  Our holding is that in this case the accused has made out a prima facie case of denial of speedy trial, by showing that his prosecution was delayed beyond the point at which a probability of prejudice arose, that he was not responsible for the delay, and that the State ought reasonably to have avoided the delay.  In these circumstances the State should be given the burden of proving that the delay was necessary and that no prejudice in fact occurred.

Hoskins, 440 F.2d at 72 (footnote and citation omitted).

As noted above, petitioner, in the instant matter, unlike the situation is Hoskins. supra, was principally responsible for the delay between the time of his arrest and the time of his trial.  Accordingly, there should be no shift of the burden of showing prejudice from petitioner to the State.  As petitioner has made no showing of prejudice, the instant claim for relief is without merit.

**F. Ineffective Assistance of Appellate Counsel**

Petitioner argues that his appellate counsel was ineffective because he failed to raise a particular claim on appeal.  Specifically, counsel failed to argue that petitioner's constitutional rights were violated due to the trial court's failure to ensure that his decision to proceed as co-counsel at trial was knowingly and intelligently made.

As set forth above, under Strickland, supra, a petitioner, for purposes of proving ineffective assistance of counsel, must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  This same two-prong test must be satisfied in order to prove ineffectiveness of appellate counsel.  See Busby v. Dretke, 359 F.3d 708, 714 (5th Cir.), cert. denied, 541 U.S. 1087 (2004) (citations omitted) ("The familiar Strickland framework applies to a prisoner's claim that his appellate counsel was ineffective for failing to raise a certain issue on appeal.").  In Smith v. Robbins, 528 U.S. 259, 288 (2000) (citation omitted), the Supreme Court held that appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  In order to prove that counsel was unconstitutionally ineffective in failing to raise particular claims, a petitioner must show "that the appeal would have had, with reasonable probability, a different outcome" if counsel had raised the requested claims.  U.S. v. Dovalina, 262 F.3d 472, 474-475 (5th Cir. 2001).

The court finds that it is not reasonably probable that petitioner's appeal would have had a different outcome if appellate counsel had raised the claim that his constitutional rights were violated by virtue of the trial court's failure to ensure that his decision to proceed as co-counsel

at trial was knowingly and intelligently made. Said claim is without merit. As noted earlier,[38] the trial court was under no constitutional obligation to ensure that petitioner's decision was knowingly and intelligently made because petitioner had no constitutional right to proceed as co-counsel. Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the instant petition of Clarence Randolph for habeas corpus relief be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this  15th  day of  January , 2008.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

---

[38]See discussion supra at pp. 16-17.